1
2
3
4
5
6
7
8                              UNITED STATES DISTRICT COURT

9                              EASTERN DISTRICT OF CALIFORNIA

10

11    AQUALLIANCE, et al.,                    Case No. 1:20-cv-00878 JLT EPG

12                         Plaintiffs,        ORDER DISMISSING FEDERAL CLAIMS AS
                                              MOOT AND DISMISSING STATE CLAIMS FOR
13    v.                                      LACK OF JURISDICTION

14
      UNITED STATES BUREAU OF
15    RECLAMATION, et al.,

16                         Defendants.

17

18                                   **I.   BACKGROUND**

19           This litigation has a lengthy backstory. In 2015, the U.S. Bureau of Reclamation and San

20    Luis & Delta Mendota Water Authority (collectively, "the Agencies"), approved a Long-Term

21    Water Transfers (LTWT) Project designed to allow sellers located upstream of the

22    Sacramento/San Joaquin Delta ("Delta") to sell/transfer water to willing buyers south of the Delta

23    over a ten-year period from 2015 through 2024. *See AquAlliance v. U.S. Bureau of Reclamation*,

24    287 F. Supp. 3d 969, 984–85 (E.D. Cal. 2018) ("*AquAlliance I*"). The 2015 LTWT Project

25    established a system by which sellers could apply to use facilities owned by the Agencies to

26    effectuate transfers to buyers. *Id*. at 985–86. With Reclamation acting as the lead agency under

27    the National Environmental Policy Act (NEPA) and San Luis acting as lead agency under the

28    California Environmental Quality Act (CEQA), the Agencies prepared and certified an

                                              1

Environmental Impact Statement/Environmental Impact Report (EIS/R) under NEPA and CEQA,[1] respectively, evaluating the 2015 LTWT Project. *Id.* at 984–85. In addition, Because the 2015 LTWT Project was anticipated to have some impact on the federally listed Giant Garter Snake (GGS), Reclamation consulted with the U.S. Fish and Wildlife Service (FWS) under the Endangered Species Act (ESA), which resulted in FWS issuing a "no jeopardy" Biological Opinion ("2105 BiOp").[2] *See Id.* at 1063–64.

Plaintiffs, along with other parties, filed a complaint in this Court on May 11, 2015, challenging the 2015 LTWT Project, EIS/R, and BiOp. (*See AquAlliance I*, No. 1:15-cv-00754-LJO-BAM (E.D. Cal.) Doc. 1.) On February 15, 2018, not quite three years later, the Court issued a 133-page ruling addressing the parties' overlength and highly complex cross motions for summary judgment, finding the 2015 LTWT EIS/R and the 2015 BiOp "at least in some part unlawful." *Id.* at 1076. *AquAlliance I* found in favor of Plaintiffs on certain issues as follows:

- The 2015 EIS/R's analysis of climate change did not comply with NEPA because it failed to explain how record information about likely changes in snowfall and snowmelt patterns could be reconciled with the conclusion in the 2015 LTWT EIS/R that climate change impacts upon the 2015 LTWT Project would be less than significant. *Id.* at 1031–32.

- The 2015 LTWT EIS/R's analysis of the cumulative impacts of the planned transfers was insufficient under CEQA because that aspect of the analysis failed to take into consideration the already otherwise-degraded condition of the Delta. *Id.*

---

[1] NEPA requires that federal agencies prepare a detailed "statement" on the environmental impacts of any federal actions "significantly affecting the quality of the human environment," 41 U.S.C. § 4332(2)(c), commonly referred to as an environmental impact statement (EIS). Similarly, CEQA requires California public agencies to conduct environmental review of discretionary projects they carry out or approve and prepare an environmental impact report (EIR) for any project that may have a significant effect on the environment. Cal. Pub. Res. Code §§ 21151, 21100, 21080.

[2] Section 7 of the ESA requires federal agencies to ensure that their activities do not jeopardize the continued existence of listed endangered or threatened species or adversely modify those species' critical habitats. 16 U.S.C. § 1536(a)(2); *see also Karuk Tribe of Cal. v. U.S. Forest Serv.*, 681 F.3d 1006, 1020 (9th Cir. 2012). When it is determined that the action may affect a listed species or critical habitat, the agency must consult with the appropriate expert wildlife agency. *Karuk Tribe*, 681 F.3d at 1027. Consultation often results in the issuance of a "biological opinion" by that wildlife agency assessing whether jeopardy to the species or its critical habitat may result from implementation of the project and sometimes suggesting alternatives that can avoid jeopardy or adverse modification. *See* 16 U.S.C. § 1536(b).

2

at 1034–37.

- The 2015 LTWT EIS/R violated CEQA because its provisions for monitoring groundwater wells within areas potentially impacted by transfers contained exceptions that were poorly defined and therefore did not ensure that the monitoring program was going to be enforceable or effective at avoiding potential significant impacts to groundwater. *Id*. at 1039–42. Relatedly, the 2015 EIS/R violated CEQA because it failed to include appropriate "performance standards" to avoid impacts to third parties from the potential impact of lowered groundwater tables. *Id*. at 1042–45.

- The 2015 EIS/R violated CEQA because the mitigation measures designed to address land subsidence contained a loophole in that would allow continued impacts to values such as aquifer capacity. *Id*. at 1048–49.

- The 2015 EIS/R violated NEPA because it did not evaluate the effectiveness of its measures designed to mitigate acknowledged impacts to groundwater. *Id*. at 1054–53.

- Finally, the BiOp's plan for mitigating impacts to GGS from Project transfers violated the ESA because it contained unclear definitions and parameters that appeared to conflict with the acknowledged need to protect certain GGS habitats. *Id*. at 1068–54.

Numerous other arguments raised by Plaintiffs were evaluated and rejected. *See generally AquAlliance I*, 287 F. Supp. 3d 969. On July 6, 2018, the Court vacated and remanded the 2015 LTWT project approvals, the 2015 EIS/R, and the 2015 BiOp, in their entireties. (*Aqualliance I*, Doc. 83.)

    In 2019, after revisions and recirculation, Reclamation and San Luis approved a similar five-year program spanning 2020-2024. (CEQA[3] 014333 (Reclamation Record of Decision); CEQA 014372 (San Luis CEQA Findings)). The Agencies again issued a combined EIS/R

---

[3] The Parties lodged separate administrative records in electronic form: one for the CEQA decision (Doc. 36); one from Reclamation for the NEPA Decision (Docs. 33, 39); and another from FWS for the ESA decision (*id*.). These are labeled CEQA, BOR, and FWS, respectively, in the record.

1    (CEQA 005213), and FWS issued a related BiOp (FWS 001462). In this lawsuit, initiated May

2    11, 2020, Plaintiffs contend that the 2019 LTWT EIS/R violates NEPA, CEQA, and the ESA, as

3    well as California's Public Trust Doctrine. (Doc. 24.) Currently pending before the Court are

4    highly complex cross-motions for summary judgment challenging the 2019 LTWT EIS/R as well

5    as the related BiOp.[4]

6         Because no Project water transfers occurred in 2022 or 2023, Federal Defendants

7    indicated in a November 2023 status report that it was unlikely that any transfers would occur

8    under the Project in 2024. (Doc. 58.) At the Court's request, the Parties provided periodic updates

9    on the challenged Project. A joint status report filed on June 10, 2024, indicated that <u>no</u> transfers

10   would occur in the final year of the Project's scope. (Doc. 68 at 2.) Though the Project originally

11   anticipated transfers up to 250,000 acre-feet of water per year, less than 250,000 acre-feet of

12   water was transferred over the entire life of the project. (Doc. 58-1, ¶¶ 4–5.) The Agencies

13   therefore argued that the case had been rendered moot. (*Id.*) On July 1, 2024, the Court ordered

14   the parties to submit supplemental briefs addressing the issue of mootness. (Doc. 69.) After

15   several stipulated extensions of time (Docs. 71, 73), the last of those supplemental briefs was

16   submitted October 11, 2024. (Docs. 76–79.) Having reviewed the entire record, the Court

17   concludes that the federal claims must be dismissed as moot and therefore that the Court lacks

18   jurisdiction to adjudicate the state claims.

19                              **II.    ANALYSIS**

20   **A.    The Federal Claims are Moot[5]**

21        "The constitutional requirement that federal courts resolve 'only actual, ongoing cases or

22

---

23   [4] Briefing on these motions concluded in January 2022. In April 2022, the matter was reassigned to the undersigned.
     (Doc. 13.) As the Court has previously indicated, a ruling has been significantly delayed by the ongoing judicial
24   resource shortage, pressing and numerous statutorily prioritized criminal matters, and other time-consuming
     emergency motions, as well as by the volume and complexity of the arguments raised and the record. (*See* Doc. 57 at
25   1 n.1.)

26   [5] Mootness must be evaluated on a claim-by-claim basis. *Pac. Nw. Generating Co-op. v. Brown*, 822 F. Supp. 1479,
     1506 (D. Or. 1993), *aff'd*, 38 F.3d 1058 (9th Cir. 1994) (internal citations omitted). The supplemental briefs primarily
27   focus on whether the federal claims in the case are moot, skirting direct analysis of whether the state claims are
     entirely moot. Nonetheless, as discussed below, if the federal claims are dismissed as moot, the state claims must be
28   dismissed as well, so the Court finds it unnecessary to evaluate independently whether the state law claims are also
     moot.

controversies' applies 'through all stages of federal judicial proceedings, trial and appellate.'"
*Wallingford v. Bonta*, 82 F.4th 797, 800 (9th Cir. 2023) (*quoting Lewis v. Cont'l Bank Corp.*, 494
U.S. 472, 477 (1990)). "[I]t is not enough that a dispute was very much alive when suit was
filed." *Lewis*, 494 U.S. at 477. For a federal court to retain jurisdiction, the parties "must continue
to have a personal stake in the outcome of the lawsuit." *Wallingford*, 82 F.4th at 800 (internal
quotations and citations omitted). "A case that becomes moot at any point during the proceedings
is no longer a 'Case' or 'Controversy' for purposes of Article III." *Id.* (citing *United States v.
Sanchez-Gomez*, 584 U.S. 381, 385 (2018)). Mootness is a question of law that the Court must
consider *sua sponte*. *Id.*

   "The basic question in determining mootness is whether there is a present controversy as
to which effective relief can be granted." *Pinnacle Armor, Inc. v. United States*, 648 F.3d 708,
715 (9th Cir. 2011) (internal citation and quotation omitted). "The question is not whether the
precise [remedy sought] is still available," but rather whether "there can be *any* effective relief."
*Nw. Envtl. Def. Ctr. v. Gordon*, 849 F.2d 1241, 1244–45 (9th Cir. 1988) (internal citation and
quotation omitted). "The party asserting mootness bears the heavy burden of establishing that
there remains no effective relief a court can provide." *Bayer v. Neiman Marcus Grp., Inc.*, 861
F.3d 853, 862 (9th Cir. 2017) "An action becomes moot only when it is impossible for a court to
grant any effectual relief whatever to the prevailing party." (*Id.* (internal citation and quotation
omitted)). Because mootness turns on the ability of the district court to award effective relief, the
Court should first consider what remedies were available to Plaintiffs, as informed by the claims
alleged in the Pleadings. *Id.*

   Plaintiffs allege four claims for relief in the operative Second Amended Complaint : (1)
that the Reclamation violated NEPA by failing to prepare a NEPA-compliant EIS for the 2019
LTWT Project; (2) that San Luis violated CEQA by failing to prepare a CEQA-compliant EIR for
the Project; (3) that San Luis further violated California's Public Trust Doctrine by failing to
"conduct any identifiable Public Trust Doctrine analysis" before implementing the Project;
(4) that FWS violated the ESA by issuing an inadequate BiOp regarding the effects of the Project
on the GGS; and (5) that Reclamation also violated the ESA by relying on FWS's inadequate

1    BiOp to adopt "Alternative 2" as the proposed agency action. (Doc. 24.) Plaintiffs seek

2    declaratory judgments that Federal Defendants violated NEPA and the ESA; a writ of mandate

3    commanding San Luis to set aside its certification of the EIS/R and approval of the Project; a

4    permanent injunction against approval of any water transfers encompassed by the Project unless

5    and until the respective statutes are complied with; and a permanent injunction ordering

6    Defendants to "return the affected environment to pre-Project conditions unless and until the

7    Projects are brought into full compliance with CEQA, NEPA, the Public Trust Doctrine, and the

8    ESA." (*Id.* at 37–38.)

9            Federal Defendants argue, straightforwardly, that the NEPA and ESA claims are moot

10   because the Project has concluded and there is no longer any relief the Court can award to

11   Plaintiffs. (Doc. 78 at 4.) The Court agrees that it can no longer "permanently enjoin Defendants

12   from approving any water transfers encompassed by the Project" (*see* Doc. 24 at 38), because the

13   Project is no more.

14           Plaintiffs focus their arguments on their request for declaratory relief. (Doc. 6 at 8, 12.)

15   But declaratory relief normally cannot satisfy Article III's case or controversy requirement where

16   the challenged analyses are no longer in force. *See Headwaters Inc. v. Bureau of Land Mgmt.*,

17   893 F.2d 1012, 1015 (9th Cir. 1989). As the Ninth Circuit explained in *Headwaters*:

18           A case or controversy exists justifying declaratory relief only when
             "the challenged government activity . . . is not contingent, has not
19           evaporated or disappeared, and, by its continuing and brooding
             presence, casts what may well be a substantial adverse effect on the
20           interests of the petitioning parties." *Super Tire Eng'g Co. v.
             McCorkle*, 416 U.S. 115, 122 (1974). The adverse effect, however,
21           must not be "so remote and speculative that there [is] no tangible
             prejudice to the existing interests of the parties." *Id.* at 123.
22

23   893 F.2d at 1015 (cleaned up); *see also Alvarez v. Smith*, 558 U.S. 87, 93 (2009) (describing a

24   moot claim as follows: "[The] dispute is no longer embedded in any actual controversy about the

25   plaintiffs' particular legal rights. Rather, it is an abstract dispute about the law, unlikely to affect

26   these plaintiffs any more than it affects other ... citizens. And a dispute solely about the meaning

27   of a law, abstracted from any concrete actual or threatened harm, falls outside the scope of the

28   constitutional words 'Cases' and 'Controversies.'"). "[D]efendants in NEPA cases face a

6

particularly heavy burden in establishing mootness" because "if the completion of the action challenged under NEPA is sufficient to render the case nonjusticiable, entities could merely ignore the requirements of NEPA, build its structures before a case gets to court, and then hide behind the mootness doctrine." *Cantrell v. City of Long Beach*, 241 F.3d 674, 678–79 (9th Cir. 2001)

Plaintiffs argue that vacating the 2019 LTWT EIS/R and declaring that EIS/R and related BiOp to be legally deficient will "provide effective relief against future agency reliance on these documents for environmental review of water transfer projects." (Doc. 76 at 11.) In support of this argument, Plaintiffs attempt to identify other environmental documents that purportedly rely on the 2019 LTWT EIS/R. First, they point to an environmental document jointly prepared by Reclamation and the Tehama-Colusa Canal Authority for the 2023 Tehama-Colusa Canal Authority In-Basin Water Transfers California project, as an example of an environmental approval document that "expressly relies" on at least one of the 2019 LTWT EIS/R's conclusions. (Doc. 76 at 13; Doc. 77 at 3 & Ex. A[6].) The document does mention the 2019 LTWT EIS/R several times, (*see* Doc. 77-1 at, Ex. A at 8, 10, 13, 15 (pp. 1-1, 1-3, 2-2, 2-4)), and appears to rely on some of the 2019 LTWT EIS/R's analysis (*id*. at 71 (p. 3-52)). However, as Federal Defendants point out, the 2023 Tehama-Colusa Canal Authority project was cancelled before approval. (Doc. 78-1, Declaration of Melissa Vignau,[7] ¶ 5.) Plaintiffs also reference the Initial Study and Proposed Mitigated Negative Declaration for Biggs-West Gridley Water District 2024 Water Transfer Program, which appears to rely upon the 2019 LTWT EIS/R and BiOp to support its conclusion that certain mitigation measures designed to protect GGS will be sufficient. (*See*

---

[6] Plaintiffs request that the Court take judicial notice of this document and several other publicly available documents issued by various public agencies. (Doc. 77.) Such public records are judicially noticeable under Fed. R. Evid. 201, as their content is not subject to reasonable dispute, though the Court may only consider them for their existence and content, not for the truth of the matters asserted therein. *Coal. for a Sustainable Delta v. Fed. Emergency Mgmt. Agency*, 812 F. Supp. 2d 1089 (E.D. Cal. 2011).)

[7] Defendants submitted Ms. Vignau's declaration alongside their response to the Court's request for supplemental briefing. (Doc. 78-1.) She is the Regional Resources Manager for Reclamation's Region 10 and has responsibility for water transfer projects, among other things. (Doc. 78-1 at ¶ 1.) The Court may consider evidence of this nature when evaluating its jurisdiction. *See Steen v. John Hancock Mut. Life Ins. Co*., 106 F.3d 904, 910 (9th Cir. 1997) ("Usually, a district court is free to hear evidence regarding jurisdiction and to resolve factual disputes in determining whether it has jurisdiction over a claim").

1    Doc. 77-1 at 91 (Ex. B at 11).) But that project, which addressed transfers only for the 2024

2    "irrigation season," likewise has expired by its own terms. (*Id.* at 81 (Ex. B at 1).) Therefore,

3    neither of these documents support a finding that the 2019 LTWT EIS/R <u>currently</u> presents the

4    kind of "continuing and brooding presence" required to demonstrate an ongoing controversy.

5            In an abundance of caution, though not explicitly mentioned in the most recent

6    supplemental briefs, the Court also has examined two documents discussed by Plaintiffs in an

7    earlier filing. First is the EIR prepared for the Western Canal Water District and Richvale

8    Irrigation District Transfers from 2023 to 2027 Project, which Plaintiff mentioned in a March

9    2024 joint status report (Doc. 62 at 3) because it purportedly cited the 2019 LTWT EIS/R on one

10   of its pages (Doc. 63 at 129 (p. 3-7)) and lists the 2019 LTWT EIS/R in its references section (*id*.

11   at 157 (p. 4-1)). First, it is unclear whether this document even cites the LTWT EIS/R at all on the

12   substantive page referenced. On that page (Doc. 63 at 129 (p. 3-7)) several environmental

13   documents are referenced as support for using "[a] 10 percent threshold in modeled flow data . . .

14   to identify  measurable changes" for purposes of evaluating impacts of water transfers on fish.

15   But the relevant page references the original <u>2015</u> LTWT EIS/R, which was revised and updated

16   by the 2019 LTWT EIS/R challenged here. Even assuming the Western Canal Water District

17   project EIR relied on the 2019 LTWT or reasoning contained therein in some material way to

18   support the use of the "ten percent threshold," there does not appear to be a link between the use

19   of that threshold and the claims Plaintiffs raise in <u>this</u> case.[8] Therefore, once again, the Western

20   Canal Water District document does not support a finding that the 2019 LTWT EIS/R has the

21   kind of "continuing and brooding presence" required to demonstrate an ongoing controversy as to

22   the LTWT EIS/R.[9] Put another way, it makes no sense to find that the 2019 LTWT EIS/R has an

23   ongoing, detrimental impact on the parties to this case simply because it is mentioned in another

24   environmental document. Rather, to support Plaintiffs' position, that other environmental

25   _____

26   [8] To the contrary, an argument premised on this ten percent threshold was rejected in *Aqualliance v. U.S. Bureau of Reclamation*, 287 F. Supp. 3d 969, 1034–35 (2018).

27   [9] In addition, Plaintiffs also noted in earlier filings the fact that sellers covered by the LTWT EIS/R are listed among
28   those listed on the State Water Resource Control Board's ("SWRCB") Potential 2024 Temporary Transfers, but many these sellers have in the past withdrawn their SWRCB transfer applications and proceeded instead under the LTWT EIS/EIR. (Doc. 62 at 3.) The Court cannot discern how this is of consequence to the mootness analysis.

1   document must carry forward reasoning that is identified as objectionable in this lawsuit. The

2   record does not demonstrate how the Western Canal Water District project does this.

3        Next, Plaintiffs argue (Doc. 76 at 12) that absent a judicial decree invalidating the LTWT

4   EIS/R, it will "be presumed forever valid by California law" by virtue of California Public

5   Resources Code § 21167.2, which provides that:

6        If no action or proceeding alleging that an environmental impact
         report does not comply with the provisions of this division is
7        commenced during the period prescribed in subdivision (c) of
         Section 21167, the environmental impact report shall be conclusively
8        presumed to comply with the provisions of this division for purposes
         of its use by responsible agencies, unless the provisions of Section
9        21166 are applicable.

10  *River Valley Pres. Project v. Metro. Transit Dev. Bd.*, 37 Cal. App. 4th 154, 178–79 (1995),

11  interpreted § 21167.2 as requiring that an EIR "be conclusively presumed valid" and therefore

12  "preclude[s] reopening of the CEQA process even if the initial EIR is discovered to have been

13  fundamentally inaccurate and misleading in the description of a significant effect or the severity

14  of its consequences." But even the LTWT EIS/R is "presumptively valid" under § 21167.2

15  because no successful challenge was mounted against it, this does not directly address the

16  question of whether the federal claims in this case are moot.[10] In other words, that a document

17  may remain "valid" for CEQA purposes has no bearing on whether it has an ongoing effect for

18  NEPA or ESA purposes.

19       In addition, Plaintiffs direct the Court's attention to public records that indicate San Luis

20  is in the process of preparing new environmental documents for a continuation of the project

21  covered LTWT EIS/R. (Doc. 77-1 at 115.) Plaintiffs generally assert that "Defendants have an

22  established history of reusing flawed analysis and mitigation measures from prior environmental

23  review conducted for past transfer programs." (Doc. 76.) The Court will evaluate that argument in

24  the context of the "capable of repetition yet evading review" exception detailed below, as to

25  otherwise would conflate evaluation of threshold mootness with that exception.

26       Finally, Plaintiffs point to *Neighbors of Cuddy Mt. v. Alexander*, 303 F.3d 1059, 1065–66

27

28  ---
    [10] If Plaintiffs meant to direct this argument only at the question of whether the CEQA claim is moot, the Court finds
    it unnecessary to address that issue. (*See supra* note 6.)

(9th Cir. 2002), where the Ninth Circuit found that a challenge to the U.S. Forest Service's approval of a timber sale was not moot despite the fact that logging had been completed because the trial court could still order other equitable measures to mitigate the damage caused, such as ordering a study on the sale's impact to old growth species. However, Plaintiffs fail to identify any form of tangible relief this Court could order that even remotely parallels that identified in *Cuddy*. (Doc. 76 at 11.) Likewise, Plaintiff's citation to *Super Tire Engineering Company v. McCorkle*, 416 U.S. 115 (1974), is unhelpful. There, the Supreme Court found that the challenged government activity—a state law providing unemployment payments to striking employees—presented a "continuing and brooding presence" even though the strike that triggered the lawsuit had concluded. *Id*. at 123–24. As the analysis above demonstrates, the record does not support a finding that the 2019 LTWT EIS/R has such an ongoing impact.

For these reasons, the Court concludes that at the very least the <u>federal</u> claims are moot. The question then becomes whether a  mootness exception applies.

**B.      Exceptions to Mootness**

1.      <u>Collateral Legal Consequences</u>

Plaintiffs attempt to parlay their argument about California Public Resources Code § 21167.2 into proof that the "collateral legal consequences" exception to the mootness doctrine applies here. That exception exists to address the potential situation where a party may suffer the unfairness of the enduring preclusive effect of a judicial determination that subsequently became unreviewable because the case became moot on appeal. *See In re Burrell*, 415 F.3d 994, 999 (9th Cir. 2005) (*citing United States v. Munsingwear, Inc*., 340 U.S. 36, 39 (1950)). It is commonly applied in habeas corpus cases to address situations where a petitioner completes a sentence before the court can address the habeas petitioner but where the petition demonstrates he will nonetheless suffer collateral consequences if the challenged sentence is permitted to stand. *See Carafas v. LaValle*, 391 U.S. 234, 237–38 (1968); *see also Williamson v. Gregoire*, 151 F.3d 1180, 1183 (9th Cir. 1998) (reviewing forms of collateral consequence in the habeas context). But, as Federal Defendants point out (Doc. 78 at 6–7), Plaintiffs do not identify any authority that suggests this exception should be applied to the circumstances of this case. Despite the potential

10

"continued validity" of the 2019 LTWT EIS/R as a CEQA document, nothing in the record or the caselaw suggest that document would have <u>preclusive</u> effect on any future administrative, regulatory, or judicial determination regarding any document issued under federal law.

### 2.   Capable of Repetition Yet Evading Review

Plaintiffs also invoke the doctrine that allows for adjudication of an otherwise moot controversy that is "capable of repetition yet [may] evade review." *Native Vill. of Nuiqsut v. Bureau of Land Mgmt*., 9 F.4th 1201, 1209 (9th Cir. 2021). (*See* Doc. 68 at 2.) This exception has two requirements: "(1) the duration of the challenged action is too short to allow full litigation before it ceases or expires, and (2) there is a reasonable expectation that the plaintiffs will be subjected to the challenged action again." *Nuiqsut*, 9 F.4th at 1209. Unlike situations where a defendant's voluntary conduct in response to litigation is the source of mootness and the burden is on the defense to demonstrate that the conduct will not recur, *W. Virginia v. Env't Prot. Agency*, 597 U.S. 697, 719 (2022), under the capable of repetition but evading review exception "the <u>plaintiffs</u> have the burden of showing that there is a reasonable expectation that they will once again be subjected to the challenged activity." *Nuiqsut*, 9 F.4th at 1209 (internal citations and quotations omitted) (emphasis added); *see also Dep't of Fish & Game v. Fed. Subsistence Bd*., 62 F.4th 1177, 1181 (9th Cir. 2023).

### a.   *Duration too Short to Allow Full Litigation*

"In assessing whether an action is of inherently limited duration in order to be considered too short to be fully litigated prior to cessation or expiration, courts tend to look at cases by type rather than individual circumstances." *Wallingford v. Bonta*, 82 F.4th 797, 801 (9th Cir. 2023) (internal citation and quotation omitted) "This is because the capable of repetition, yet evading review exception is concerned not with particular lawsuits, but with classes of cases that, absent an exception, would always evade judicial review." *Id*.

> Though there is no bright-line rule, when assessing the classes of cases inherently limited in duration, actions lasting more than two years are frequently considered long enough to be fully litigated prior to cessation, while actions lasting less than two years are considered too short. *Compare Karuk Tribe of California v. U.S. Forest Serv*., 681 F.3d 1006, 1018 (9th Cir. 2012) (en banc) (actions lasting "only one or two years" evade review), with *Hamamoto v. Ige*, 881 F.3d

719, 722–23 (9th Cir. 2018) (action lasting two years and five months sufficiently long).

*Id.*

Plaintiffs suggest that the Court should take into consideration in this evaluation its own impacted caseload, because the delays that have resulted from docket congestion are "exigencies beyond the Court's control, which will likely persist if and when Plaintiffs are positioned to challenge the forthcoming long-term transfer project contemplated by Reclamation and SLDMWA." (Doc. 76 at 16.) Federal Defendants are correct (*see* Doc. 78 at 7–8) that Ninth Circuit authority appears to call for a more categorical approach to evaluating this prong. *See Ctr. for Biological Diversity v. Lohn*, 511 F.3d 960, 965 (9th Cir. 2007) (indicating that courts must consider whether "the injury suffered [is] of a type inherently limited in duration such that it is likely always to become moot before federal court litigation is completed").

There is nonetheless reason to consider departing from the two-year benchmark in cases like this one. As mentioned, *Aqualliance I* took approximately three years to reach judgment. Though not the single most voluminous matter pending before this Court, this case is nonetheless highly complex, with three administrative records totaling more than 200,000 pages of material. It took more than 18 months for dispositive motions to become ripe. Moreover, the resulting cross motions for summary judgment briefs raise dozens of issues, many of which direct the Court's attention to extensive material elsewhere in the record.[11] Even in the best of times in a District with a more manageable caseload, four years might not have been enough time to fully litigate the matter. Nonetheless, the Court finds it unnecessary to definitively reach beyond the two-year benchmark because Plaintiffs fail to carry their burden as to the second prong of the capable of repetition yet evading review exception.

b.    *Reasonable Expectation of Repetition.*

As the Court previously explained (Doc. 69 at 2–3), in the context of a challenge to an

---

[11] The Parties jointly proposed (Doc. 25 at 8) and the Court subsequently ordered (Doc. 32 at 2–3) that Plaintiffs should be permitted a total of 90 pages for all their briefing, with Federal Defendants and San Luis being allotted 60 pages each. This was a strategic decision that has consequences, as it made it markedly more time consuming for the Court to evaluate the pending motions.

environmental document, Ninth Circuit authority suggests that a plaintiff must demonstrate not only that the same kind of project activity will recur, but also that the challenged <u>reasoning</u> will be relied upon in a subsequent environmental document. *See Ramsey v. Kantor*, 96 F.3d 434, 446 (9th Cir. 1996). The *Ramsey* plaintiffs challenged a 1993 fisheries management decision that had been supported by a biological opinion. *See id*. at 445. When the 1993 decision was rendered moot, the plaintiffs argued the case should nonetheless continue because the 1994 decision relied on that same biological opinion. *See id*. at 445–46. The Ninth Circuit disagreed because, though the 1994 decision relied on the biological opinion for some inputs, the agency was using a different "method of calculating" the environmental impacts. *Id*.; *see also Nuiqsut*, 9 F.4th at 1210.("[W]hen an agency 'rel[ies] on the same biological opinion' but 'us[es] a different method of calculating' the final course of action in future environmental reports, the case is moot.") (*citing Ramsey*, 96 F.3d at 446); *Fed. Subsistence Bd*., 62 F.4th at 1184 ("[W]hen future decisions will be based on different criteria, factors, or methods, we have also found no reasonable expectation of repetition.").

Plaintiffs point to *Sequoia ForestKeeper v. Benson*, 108 F. Supp. 3d 917 (E.D. Cal. 2015), where the plaintiff challenged the Forest Service's approval of a hazard tree removal project, which involved the felling of hazard trees along roads and within developed campgrounds and residential areas. *Id*. at 921. The Forest Service approved removal of those downed trees, instead of the alternative preferred by the plaintiff, which would have left them in place. *Id*. The plaintiff alleged generally that the approval was inconsistent with other mandatory requirements not to remove trees from the project area unnecessarily and that the forest service failed to disclose how it would determine whether tree removal could be justified, among other things. *Id*. at 921–22. The *ForestKeeper* court found persuasive the argument that plaintiff had "a reasonable expectation that it will again have to litigate the issue of whether tree removal is clearly needed and whether the Forest Service can remove trees without first assessing it will meet its down log standards, under the same circumstances . . . in future hazard tree projects in the Monument," and therefore that a declaratory judgment on plaintiff's claims would provide meaningful relief. *Id*. at 927–28.

13

1    Plaintiffs attempt to demonstrate that they are likely to engage in similar litigation in the

2    future, but the examples they give are not persuasive. For example, Plaintiffs' motion for

3    summary judgment argues that the 2019 LTWT EIS/R is "inadequate as an informational

4    document" under both NEPA and CEQA in part because it is so disorganized that it disorients the

5    reader. (*See* Doc. 40 at 23–26.) Instead of straightforwardly pointing to another environmental

6    document addressing a similar project that is similarly disorganized, Plaintiffs argue:

> The Tehama-Colusa IS/EA, expressly relies on the EIS/R's conclusion that "cumulative change in flow due to transfers would not reduce the suitability of habitat conditions..." for certain fish species. Flanders Decl., Exhibit A at 68-69. Yet, and as alleged and argued by Plaintiffs, the EIS/R's cumulative impacts analysis is flawed and the EIS/R otherwise fails as an informational document, including but not limited to, in its discussion of cumulative impacts of the Project to stream flows. Dkt. 24 at 31-32; Dkt. 40 at 24. The Biggs-West Gridley IS/MND, furthermore, selects and formulates proposed measures to mitigate impacts to the GGS "[b]ased on the information . . . contained in the . . . [EIS/R] and the [2019 BiOp.]" Flanders Decl., Exhibit B at p. 13 (modifications added). Again, Plaintiffs contend this information is illegally deficient under both NEPA and CEQA. Dkt. 24 at 28-29; Dkt. 40 at 23-24. Here, environmental analysis for these subsequent water transfers builds off of and perpetuates the same informational deficiencies of the EIS/R. Reclamation and state agencies' past and current reliance on the EIS/R for these purposes demonstrates that there is a reasonable expectation that they will continue to do so in the future; as to this issue, therefore, the case is not moot.

18   This does not articulate a clear connection between reasoning (or even between a specific

19   structural or organizational defect) in the 2019 LTWT EIS/R and either of the other

20   environmental documents mentioned.

21   Plaintiffs next argue that the 2023 Tehama-Colusa Canal Authority project environmental

22   document mentioned above "recycles nearly verbatim the EIS/R's Mitigation Measure VEG and

23   WILD-1 to mitigate impacts to the GGS" which are challenged in the present lawsuit as

24   "critically flawed." (Doc. 76 at 18.) In addition, Plaintiffs point out that the 2023 Tehama-Colusa

25   environmental document also references the 2019 LTWT BiOp and therefore "perpetuates and

26   relies on the same flaws in the 2019 BiOp as alleged here." (*Id*. at 18–19.) But, again, the 2023

27   Tehama-Colusa Canal Authority project was never approved. Even if that project had been

28   approved it would have overlapped temporally with the 2024 LTWT EIS/R, so it is difficult to see

how that project's document could establish the kind of "repetition" required to trigger this mootness exception.

Next, Plaintiffs attempt to demonstrate a reasonable expectation of repetition by showing parallels between *AquAlliance I* and this case. Indeed, whether similar events occurred in the past is potentially dispositive of the application of the "capable of repetition but evading review" exception. *See ForestKeeper*, 108 F. Supp. 3d at 927 (citing *Demery v. Arpaio*, 378 F.3d 1020, 1027 (9th Cir. 2004) (repeated past conduct on multiple occasions taken as evidence of likely repetition); *Natural Resources Defense Council, Inc. v. Evans*, 316 F.3d 904, 910 (9th Cir.2003) (same, noting that agency repeatedly applied the same, challenged rationale, "year after year")). On this point, Plaintiffs argue that Defendants have "repeatedly failed to adequately assess climate change impacts." (Doc. 76 at 19–20.) But Plaintiffs fail to address the mootness inquiry at an appropriate level of detail. The caselaw requires a certain amount of granularity on this issue. In *Evans*, for example, the plaintiff challenged an agency's invocation of the "good cause" exception to the Administrative Procedure Act's notice and comment requirements. 316 F.3d at 906. The Ninth Circuit rejected the agency's argument that the trial court had improperly assumed agency conduct would be similar in the future, finding instead that the agency had invoked the exception "on the same basis for each set of annual specifications and management measures" and therefore that the capable of repetition yet evading review exception applied. *Id.* at 910–12; *see also Nuiqsut*, 9 F.4th at 1210.("[W]hen an agency 'rel[ies] on the same biological opinion' but 'us[es] a different method of calculating' the final course of action in future environmental reports, the case is moot."); *Fed. Subsistence Bd*., 62 F.4th at 1184 ("[W]hen future decisions will be based on different criteria, factors, or methods, we have also found no reasonable expectation of repetition.").

As mentioned above, *AquAlliance I* found that the 2015 EIS/R's analysis of climate change did not comply with NEPA because it failed to explain how record information about likely changes in snowfall and snowmelt patterns could be reconciled with the conclusion in the 2015 EIS/R that climate change impacts upon the 2015 LTWT Project would be less than significant. 287 F. Supp. 3d at 1031–32. Here, though the pending motions certainly raise climate change issues, they are not the same (or even substantially similar) issues raised or decided in *AquAlliance I*. Rather, here, Plaintiffs

1    make two substantive arguments in their motion for summary judgment regarding climate change.

2    First, they argue that the 2019 LTWT EIS/R does not properly evaluate the extent to which the Project

3    itself will exacerbate climate change impacts, such as to special status fish and streamflow (Doc. 40 at

4    40–42.) This is analytically distinct from the flaw identified in *AquAlliance I*. Second, Plaintiffs argue

5    here that the 2019 LTWT EIS/R "arbitrarily disregards the potential impacts presented by a modeled

6    "hot-dry" climate change scenario. (Doc. 40 at 42–43.) Again, the Court can discern no connection

7    between that flaw and the challenges brought against the environmental documents at issue in

8    *AquAlliance I*.

9         Plaintiffs' make one other attempt to show likelihood of repetition based on purported

10   parallels between *AquAlliance I* and this case. CEQA requires that whenever an EIR finds than an

11   impact to the environment may be significant, the EIR must propose mitigation measures to

12   minimize those significant effects. *See* Cal. Pub. Res. Code § 21100(b)(3). To accomplish this, an

13   EIR may specify "performance standards" which, if met, would mitigate the significant effects.

14   *See* CEQA Guidelines § 15126.4(a)(1)(B). In reference to a specific technical report mentioned in

15   the 2015 LTWT EIS/R, *AquAlliance I* explained that the EIS/R could not rely on another

16   document to articulate "performance standards," but instead "must stand on its own in terms of its

17   requirements and performance standards." 287 F. Supp. 3d at 1040–41. Notably, the technical

18   report in question specifically disclaimed that it did not intend to address CEQA requirements. *Id*.

19   at 1040.

20        In the present case, Plaintiffs make a much more specific argument than was addressed by

21   *AquAlliance I* in relation to the relevant technical report. Specifically, they argue that the 2019

22   LTWT EIS/R's mitigation measure for groundwater impacts fails to provide any procedures "for

23   third parties to make a claim of land subsidence; how and by whom a claim will be reviewed and

24   approved; what information is required to make a claim; or whether a claim of impacts or injury

25   that occurs after the year of the transfer pumping will be accepted." (Doc. 40 at 35.) Plaintiffs

26   argue that "Defendants attempt to remedy this deficiency" by referencing an updated version of

27   that same technical report discussed in *AquAlliance I* and therefore are again impermissibly trying

28   to "bootstrap external documents in support of insufficient mitigation measures." (Doc. 76 at

16

20[12].) The Court fails to see the requisite parallelism. The issue in the present case, while generally related, is significantly more nuanced and is focused on facts that appear to be specific to the 2019 LTWT record.

Perhaps in implicit recognition of how common it is for environmental disputes to evolve and change over time, Ninth Circuit authority more recent than *Sequoia ForestKeeper* has clarified the requisite mootness analysis.

> In most NEPA cases, the inquiry for the "capable of repetition" prong of the mootness exception is relatively simple. Our precedent has focused on whether the environmental report at issue is confined to the challenged action only, or whether the agency will use that same report in approving a future project. If the latter is true, then the case is not moot. [*Greenpeace Action v. Franklin*, 14 F.3d 1324, 1330 (9th Cir. 1992)](holding that the case was not moot because the Secretary of Commerce "ha[d] relied on the same biological opinion" for both the challenged action and a subsequent action). In contrast, when the environmental report at issue "has been superseded, and the federal agencies will rely" on a new and different report "for the near future," the case is moot. *Idaho Dep't of Fish & Game v. Nat'l Marine Fisheries Serv.*, 56 F.3d 1071, 1075 (9th Cir. 1995). Similarly, when an agency "rel[ies] on the same biological opinion" but "us[es] a different method of calculating" the final course of action in future environmental reports, the case is moot. *Ramsey v. Kantor*, 96 F.3d 434, 446 (9th Cir. 1996).

*Nuiqsut*, 9 F4th at 1210. In *Nuiqsut*, the Ninth Circuit concluded that the case was moot because (1) circumstances indicated that any future agency action was unlikely to rely/tier off the environmental document and (2) the legal landscape had changed as a result of the promulgation of new NEPA regulations that would directly impact the plaintiff's claims. *Id*. at 1210–22.

Like in *Nuiqsut*, Reclamation has directly indicated that at least it will not directly rely on the 2019 LTWT EIS/R in any future review of similar transfer projects. (Doc. 78-1 at 4 ("Should there be future similar transfer of water in 2025 or later that require Reclamation approval, Reclamation will perform new environmental analyses under NEPA and the ESA," which "will include new data, such as ongoing monitoring of the Giant Garter Snake and up-to-date-studies of regional conditions.").) Absent evidence to the contrary, the Court will take this at face value.

---

[12] The Court notes that Plaintiffs' reading of the record on this is disputed. In response to a comment on this very issue, the Agencies explained that the 2019 EIS/R does not "defer" to the technical report but instead "include[d] the document as guidance when developing mitigation measures." (CEQA 008143.) The Agencies insisted "[t]he mitigation measures included in the EIS/EIR have been developed to be independent, and in several cases, are more restrictive than the measures included in the 2015 guidance document." (*Id*.)

For all the above reasons, the Court finds that the Plaintiffs have not met their burden to show that the capable of repetition yet evading review mootness exception should apply. Absent an applicable exception, the NEPA and ESA claims are moot.

**C.     Request for Discovery**

Plaintiffs alternatively argue that they should be entitled to engage in discovery as to the content and analysis of any planned subsequent environmental review and/or a stay pending promulgation of that subsequent review. (Doc. 76 at 16.) Absent discovery or a stay, Plaintiffs claim "it would be manifestly unjust to dismiss this case only to have Defendants repeat the same flawed analysis months later." (*Id.*)

A request for jurisdictional discovery may sometimes be appropriate when jurisdictional facts are contested or more facts are needed. *See Laub v. U.S. Dep't of Interior*, 342 F.3d 1080, 1093 (9th Cir. 2003). But nothing in the record suggests any such facts are presently discoverable.[13] Moreover, Plaintiffs do not cite, and the Court has not been able to independently identify, any authority permitting it to stay a matter to determine whether an otherwise moot case will become "un-moot" sometime in the future.

Plaintiffs further contend it would likewise be "an egregious waste of judicial resources to moot this case – which is over four years old and fully briefed – when, in all likelihood, Defendants will again promulgate a flawed that will EIR/R necessitate further suit." (*Id.*) This is not persuasive for several reasons. First, the interests of judicial efficiency do not dictate the scope of the Courts jurisdiction, which is constrained by the Article III of the Constitution. Moreover, the Court seriously doubts that it would serve the interests of judicial efficiency to bring the pending motions to resolution. Given that the Court cannot identify any issues from *AquAlliance I* that arise in a substantially similar way in the pending motions, the Court is dubious that resolving the claims in this case would materially inform any forthcoming analysis in a future LTWT project. The Court believes it would be a far more efficient use of judicial resources to focus on challenges that are directly relevant to any future environmental analyses.

---

[13] Of course, nothing is stopping Plaintiffs from using public records requests to obtain relevant information available through those means.

18

1    **D.      Supplemental Jurisdiction**

2           "[D]istrict courts may decline to exercise supplemental jurisdiction over a[ ] claim if . . .

3    the district court has dismissed all claims over which it has original jurisdiction." 28 U.S.C.

4    § 1367(c)(3). However, district courts only have discretion to retain state law claims "[i]f the

5    district court dismissed all federal claims on the merits." *Herman Family Revocable Trust v.*

6    *Teddy Bear*, 254 F.3d 802, 806 (9th Cir. 2001). Where the district court "dismisses [all federal

7    claims] for lack of subject matter jurisdiction, it has no discretion and must dismiss all [state law]

8    claims." *Id*. Given the dismissal of the federal claims on jurisdictional grounds, the Court must

9    also dismiss the state law claims, for which no other jurisdictional hook exists.

10                              **III.     CONCLUSION AND ORDER**

11          For the reasons set forth above, the NEPA and ESA claims asserted in the operative

12   complaint are **DISMISSED** as moot. As a result, the Court lacks jurisdiction over the remaining

13   state law claims which are **DISMISSED** for lack of jurisdiction.

14          The Clerk of Court is directed to **TERMINATE ALL PENDING MOTIONS AND**

15   **CLOSE THIS CASE**.

16

17   IT IS SO ORDERED.

18      Dated:   **November 11, 2024**

                                                    UNITED STATES DISTRICT JUDGE

19

20

21

22

23

24

25

26

27

28

19